**Illario M.A. ZANNINO, Plaintiff**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 92–10300–WGY.**

United States District Court,
D. Massachusetts.

Nov. 30, 1994.

**80**

William M. Kunstler, New York City, for petitioner.

Ernie DiNisco, Boston, MA, for respondent.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

Illario Zannino ("Zannino") has petitioned this Court for habeas corpus relief from his sentence pursuant to 28 U.S.C. § 2255.[1] Zannino claims that he was denied a fair trial by the ineffective assistance of counsel. Specifically, Zannino alleges that his trial counsel, Joseph J. Balliro, Esq. ("Balliro"), (1) failed to introduce evidence gained from an interview with a government witness, Donald Smoot ("Smoot"), which allegedly contradicted testimony given by Smoot at trial; and (2)

---

1. 28 U.S.C.A. § 2255 provides in pertinent part:

   A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside, or correct the sentence.

   A motion for such relief may be made at any time.

   Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

denied him the right to testify in his own behalf.

## I. BACKGROUND

The history of the case against Zannino spans the better part of eleven years. In 1983 Zannino was indicted, along with six co-defendants,[2] on charges of loansharking and gambling, and for violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C.A. 1961–68 (1984 & Supp. 1993), as a member of the Patriarca family of "La Cosa Nostra."

Prior to trial, Zannino suffered a heart attack which resulted in the severance of his trial from that of his co-defendants. Zannino then moved to continue his trial indefinitely because of his ill health. A magistrate judge conducted an evidentiary hearing and ruled that the medical dangers of going to trial were remote, that Zannino's heart condition was controllable, that Zannino was likely to suffer chest pains whether or not he was tried, and that the permanent nature of the condition militated in favor of a quick trial to prevent worsening of the condition. *United States v. Zannino*, 1985 WL 2315, at *4, *5 (D.Mass. June 3, 1985) (Alexander, M.J.).[3]

Zannino's co-defendants went to trial first. In one of the longest cases ever tried in this District, Smoot was one of many witnesses who testified for the government. In the main, the government secured verdicts of guilty. The convictions were affirmed on appeal. *See United States v. Angiulo*, 897 F.2d 1169, 1176, 1216 (1st Cir.), *cert. denied*, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).

The government's case against Zannino was built largely upon the results of electronic surveillance of 98 Prince Street in Boston's North End. Government agents had recorded conversations within the premises, and had photographed persons going in and out of the building. At trial, the government put forward conversations, obtained through judicially authorized hidden microphones, which indicated that (1) from at least the fall of 1980 to the spring of 1981, a high-stakes poker game was conducted by Zannino and four others at that location; (2) Zannino had a financial stake in a "barbooth"[4] gambling business conducted in Lowell; and (3) Zannino had engaged in loansharking activities involving Smoot. The government proffered corroborating evidence through the police who had executed a valid warrant to search the Lowell premises where the "barbooth" game had taken place.[5] Smoot, however, died before the start of Zannino's trial, and the admission of his testimony from the prior trial was hotly contested.[6]

The jury found Zannino guilty of both gambling charges and The loansharking charge. When the verdict was announced, Zannino stated, "I hope the jury all dies tonight." He was later sentenced to five years on each gambling count and twenty years for the extortionate loan, each sentence to run consecutively.

Zannino immediately appealed his conviction on numerous grounds, four of which were addressed by the First Circuit. The appellate court upheld the district court's rulings on (1) the use in Zannino's trial of testimony by Smoot from the earlier trial of Zannino's co-defendants; (2) the admissibility of the electronic surveillance; (3) the sufficiency of the evidence; and (4) the "flagship

---

**2.** His co-defendants were Gennaro Angiulo, Francesco Angiulo, Nicolo Angiulo, Donato Angiulo, Michele Angiulo, and Samuel Granito. *See United States v. Zannino*, 895 F.2d 1, 3 n. 1 (1st Cir.), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

**3.** For a detailed review of Zannino's medical record at this point, see *Zannino*, 895 F.2d at 12–13.

**4.** "Barbooth is a fast paced dice game in which one wins or loses by shooting certain combinations of numbers. The house provides the dice, the situs, and the croupier. Typically, 15 to 35 people bet on whether the shooter will throw a winning combination. The house does not bet its own money, but takes a percentage, called a 'rake,' typically 2½% of each bet." *Zannino*, 895 F.2d at 4 n. 5.

**5.** For a more thorough discussion of the government's case at trial, see *Zannino*, 895 F.2d at 3–5.

**6.** Smoot's transcript testimony and the subsequent dispute concerning its admissibility is more fully discussed in *Zannino*, 895 F.2d at 5–8.

claim—that [Zannino's] ill health required more solicitous treatment than was received." *Zannino*, 895 F.2d at 5.[7] Throughout his trial, appeal, and motion to revise sentence, Zannino was represented by Balliro.

The present petition for habeas relief was filed in 1992 by another attorney, who is not a member of the bar of this court, and is unsupported by brief or memoranda.[8] In his petition, Zannino now makes two specific arguments in support of his claim of ineffective assistance of counsel. This Court addresses each claim separately.

## II. DISCUSSION

### A. *Failure to admit or seek admission of taped interviews*

■ Zannino asserts that Balliro's failure to proffer exculpatory evidence obtained during a taped interview Balliro held with Smoot amounted to ineffective assistance of counsel.[9] This assertion compels the Court to engage in the analysis set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland*, the Supreme Court held that in order to prove that an attorney's performance was so deficient as to violate the Sixth Amendment's guarantee of assistance of counsel, a defendant must show both that "counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. at

2064, 2067. Thus, in order to demonstrate that his counsel was ineffective, Zannino must show that Balliro's failure to seek admission of the tapes of the interview was objectively unreasonable and that this failure resulted in prejudice to Zannino.

In evaluating an attorney's performance, a court must consider "whether counsel's assistance was reasonable considering all the circumstances." 466 U.S. at 688, 104 S.Ct. at 2064. Furthermore, "in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 688–689, 104 S.Ct. at 2065–66. This Court, therefore, does not sit in judgment of the wisdom of the attorney's tactical decisions.

Numerous factors may have contributed to the decision not to introduce the tapes. For example, the record demonstrates that Balliro focused a great deal of attention on suppressing Smoot's previous testimony as inadmissible hearsay. *See Zannino*, 895 F.2d at 5–8. The interview, while exculpatory in some respects, was not so uniformly, and to the extent that it corroborated Smoot's prior testimony, it contributed to the "indicia of reliability" which ultimately formed the basis for the First Circuit's decision to affirm its admission. *See Zannino*, 895 F.2d at 6–7. Further, the interview buttressed what the First Circuit considered "the functional equivalent of cross-examination"—referring to the vigorous cross-examination of Smoot by Zannino's co-defendants' lawyers in the *Angiulo* trial. *Zannino*, 895 F.2d at 6.

---

7. The First Circuit summarily rejected the remainder of Zannino's claims. *See Zannino*, 895 F.2d at 5. Zannino's motion for a reduction of his sentence was later denied by this Court. *See United States v. Angiulo*, 852 F.Supp. 54, 62 (D.Mass.1994).

8. Zannino did submit two affidavits of his trial counsel: (1) the Affidavit of Joseph J. Balliro, dated November 29, 1991 ("Balliro Affidavit I"); and (2) an untitled affidavit dated simply November, 1991 ("Balliro Affidavit II").

9. Zannino's trial counsel states in pertinent part:
    5. I interviewed Donald Smoot in connection with the governments (sic) contention that Mr. Zannino had extorted money from Mr. Smoot.

6. Mr. Smoot told me that:
    a. Mr. Zannino was a friend of his who always tried to be of help to him and on many occasions had been of help to him;
    b. That Mr. Zannino never threatened Mr. Smoot either directly or indirectly;
    c. That Mr. Zannino never shylocked money to Mr. Smoot;
    d. That Mr. Smoot had no fear of Mr. Zannino at any time, and;
    e. Mr. Smoot made it perfectly clear to me that he did not agree that Mr. Zannino had extorted money from him and that he had told representatives of the government that he did not agree.

Balliro Affidavit I, ¶¶ 5–6.

Thus, while the content of the Smoot interview detracted from the credibility of Smoot's testimony, this advantage had to be balanced against the fact that introduction of the tapes of the interview would significantly undercut the argument against the admissibility of the prior testimony—an argument carefully preserved for appeal. Trial counsel thus appears to have made a tactical decision to press for suppression of the testimony and not risk undermining this position by attempting to introduce the information gathered in the interview. This did not constitute ineffective assistance of counsel.

## B. *Denial of the Right To Testify*

■ Zannino has put forward his own affidavit and Balliro Affidavit II in support of this second prong of his ineffective assistance claim. The affidavits allege that after informing the jury of Zannino's intent to testify, trial counsel, of his own volition, and in direct contradiction of his client's orders, rested the case without calling Zannino to the stand.[10] Zannino claims that he was too ill at the time publicly to refute the decision of trial counsel.[11]

■ "[A] criminal defendant must claim his privilege or right to testify by attempting to take the stand or it is waived." *Siciliano v. Vose,* 834 F.2d 29, 30 (1st Cir.1987) (Breyer, J.) (citation omitted). In attempting to circumvent this rule, Zannino has put forward the argument that his ill health prevented him from objecting publicly to the decision of his trial counsel. Since this Court is proceeding without taking live testimony, it is required to accept Zannino's allegations as true, "except to the extent they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *United States v. Mosquera,* 845 F.2d 1122, 1124 (1st Cir.1988) (per curiam); *see also Barrett v. United States,* 965 F.2d 1184, 1186 (1st Cir.1992) ("if [petitioner's] claim is based upon facts with which the trial court, through review of the record or observation at trial, is familiar, the court may make findings without an additional hearing, and, as is the case for findings of the trial court generally, those findings will not be overturned unless they are clearly erroneous") (quoting *United States v. Di Carlo,* 575 F.2d 952, 954–55 [1st Cir.], *cert. denied,* 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 129 [1978]); *Myatt v. United States,* 875 F.2d 8, 11 (1st

---

10. Trial counsel states, in pertinent part:

> 4. During the trial of the within indictment, in my opening statement of (sic) the jury, I said that the defendant would take the stand in his own behalf....
>
> 5. I did this with the full consent of the defendant who had insisted that he be allowed to so testify.
>
> 6. However, without consulting the defendant and against his wishes as made known to me from the beginning of my representation of him, I rested his case without calling him to the stand.
>
> 7. Because of his extreme heart condition and the effect it had upon both his physical and mental states, he was unable to protest my failure to adhere to the specific instructions he had given me to permit him to testify on his own behalf.
>
> 8. While I admit that I disobeyed his instruction in this regard, I did so because I felt that it would endanger his precarious health to subject himself to the rigors of cross examination by Government counsel.
>
> 9. It is now obvious to me that in announcing to the jury, during my opening, that Mr. Zannino would testify on his own behalf and then preventing him from doing so jeopardized his chance of an acquittal.

Balliro Affidavit II, ¶¶ 4–9.

11. Zannino states, in pertinent part:

> 2. At the beginning of my trial, I insisted to my trial counsel, Joseph J. Balliro, that I wanted to testify in my own behalf. He then told the jury, in his opening statement, that I would take the stand.
>
> 3. During the trial, I kept telling Mr. Balliro that I wanted desperately to testify, but, when the prosecution rested, he told the court that I would not testify. "I made the decision," he said, "Mr. Zannino is not going to testify. I don't feel he is well enough to testify." ...
>
> 4. I was shocked by this statement but I was unable, given my health condition, to object publicly to a decision that went against my express wishes to my lawyer.
>
> 5. Even though I was terribly sick during my trial, I would have been able to testify. I was not consulted in any way by Mr. Balliro prior to his statement that he had decided not to put me on the stand and had no idea that he was not going to follow my persistent instructions that I wanted to testify in my behalf. I assume that he thought he was trying to prevent any further injury to my health by making the decision to violate my direction to him, but it was my decision, not his, to make.

Affidavit of Illario M.A. Zannino, June 1, 1994, ¶¶ 2–5.

Cir.1989) ("Even if a § 2255 motion is facially adequate, a hearing is not necessary before dismissal if the motion is 'conclusively refuted as to alleged facts by the files and records of the case'") (quoting *Moran v. Hogan*, 494 F.2d 1220, 1222 [1st Cir.1974]).

This Court will thus explore the extent to which these allegations are consistent with the trial and appellate record and the relevant papers in the proceedings before it. In Zannino's appeal from his conviction, he argued, *inter alia*, that the deterioration of his medical condition prevented him from being able to testify in his own behalf at all:

> Appellant [Zannino] also asserts that his health deteriorated under the strain of trial, creating a special sort of prejudice. The thesis runs along the following lines: in his opening statement, defense counsel, not knowing how the vagaries of trial would affect a sick man, told the jury that Zannino's testimony was crucial to an understanding of the case; due to failing health, however, Zannino proved unable to testify when it came time for the defense case; thus, the jury, expecting to hear Zannino's testimony, most probably held his failure to testify against him....
>
> We find this logomachical frock gaping at several seams. Most critically, *there is not a shred of evidence that Zannino's condition worsened to the point where he became medically unable to testify*. There was excellent reason, tactically, for Zannino to avoid the witness stand. That he decided not to testify, and that his counsel intimated to the jury that his health precluded him from testifying, is a far cry from proving either the claimed deterioration or the etiology of the decision to stay off the witness stand.

*Zannino*, 895 F.2d at 15 (emphasis supplied). Now, having failed to convince the First Circuit that he was medically unable to testify, Zannino has apparently decided to reverse position.

Zannino now argues that he was medically able to testify but that he was not medically able to make a public objection to his counsel's decision to rest his case. Not only is this inconsistent, as the strain of testifying would in all likelihood exceed the strain of objecting publicly to his counsel's refusal, it is rebutted by the record of the case. The medical evidence, as noted by the First Circuit, is devoid of support for Zannino's contention he was unable to testify, and consequently is also devoid of evidence that his condition worsened to the point where he was unable to object to counsel's decisions. *See Zannino*, 895 F.2d at 15.

Furthermore, the record of the case belies Zannino's assertion that he was unable "publicly [to] object." Zannino interjected his opinion several times in the proceedings. His medical condition did not prevent him from asserting soon after the verdict was announced in a voice loud enough to be heard by the judge and jury, "I hope the jury dies tonight." Trial Transcript, Vol. 22, at 11–12, 27, 32–3337–38; Government's Response to Plaintiff's Motion for Relief Pursuant to 28 U.S.C. § 2255, at 30–33 (listing numerous examples of Zannino's ability "publicly [to] object").

In short, this Court finds Zannino's affidavit incredible and unworthy of belief. Other than his own subjective conclusion, there is simply no evidence that he was medically unable promptly to object to the decision to rest his case without his testimony.[12] Not only is his present position factually inconsistent with that asserted on appeal, Zannino was well aware of his right to testify and of the "excellent" tactical reasons for staying off the stand, *Zannino*, 895 F.2d at 15, and never expressed displeasure with Balliro's performance before filing this petition.[13] Indeed, for years thereafter— throughout the course of his entire appeal to the First Circuit and the hearing on his

---

12. To the extent that Balliro Affidavit II seems to support Zannino's contention that he was unable to object, this Court rejects it as conclusory. *See* Balliro Affidavit II, ¶ 7, *supra* n. 10. This Court is not required to accept conclusory assertions. *See United States v. Mosquera*, 845 F.2d 1122, 1124 (1st Cir.1988) (per curiam).

13. At the time of his sentencing, Zannino stated to the Court, "I'm sorry the day I said I hope the jury dies [the day of the verdict], but I thought Joe [Balliro] won the case out and out." Trial Transcript. Vol. 22, at 27.

motion to revise his sentence before this Court—Zannino relied on Balliro to present and argue his cause. This is odd behavior indeed from one who claims he was betrayed on a vital issue by his attorney.[14]

Furthermore, Zannino's counsel on the instant petition did nothing whatsoever to press the matter upon the Court. The petition itself, filed January 31, 1992, was discovered this year only through the Court's own internal CHASER program and resuscitated only due to a call from Courtroom Deputy Clerk Elizabeth Smith. As the First Circuit has remarked in a related context, "Given the totality of the circumstances ... [Zannino's] lassitude serves to cast considerable doubt upon the legitimacy of his professed reason for seeking to change course." *United States v. Gonzalez–Vazquez*, 34 F.3d 19, 23 (1st Cir.1994).

There remains, however, Balliro Affidavit II. Balliro is an outstanding attorney of proven integrity at the bar of this Court and the courts of the Commonwealth of Massachusetts. This Court will not lightly disregard the affidavit of one of its preeminent officers. Stripped of the conclusory allegations in paragraphs seven and nine of Balliro Affidavit II, however, little remains to support Zannino's discredited assertions. The Court credits that the original trial strategy involved putting Zannino on the stand. Balliro Affidavit II, ¶¶ 4, 5. This Court finds, however, that this strategy evolved over the course of the trial so that, at the time Balliro rested Zannino's case, Balliro well knew he had the authority to do so without calling Zannino to testify. It is thus immaterial that Zannino had expressed a different view at the outset of the trial and for some time thereafter or that Balliro did not consult directly with Zannino immediately before resting his case. Balliro Affidavit II, ¶ 6. Therefore, the Court does not credit Balliro Affidavit II to the extent that it avers Balliro knowingly disobeyed his client when he rested his case. The Court finds, further, that any instructions to permit Zannino to testify came well after the verdict in the form of recrimination by a disgruntled Zannino.

Based upon the facts and record of the case, this Court rejects Zannino's claim that his ill health prevented him from asserting his right to take the stand. Consequently, Zannino's failure to object to counsel's decision to rest the case constituted a waiver of his right. *Siciliano*, 834 F.2d at 30. Zannino waived his right to testify as part of a strategy which included, and anticipated, arguing on appeal that his failing health prevented him from testifying and therefore deprived him of a fair trial. That his claim was rejected provides no ground to come before this Court and request a new trial. Defendants are entitled to fair trials, not to relitigate every possible strategy which might have resulted in acquittal.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs motion for relief pursuant to 28 U.S.C. § 2255 is DENIED.

---

14. Zannino even went so far as to declare at his sentencing, "Mr. Joseph Balliro, as far as I'm concerned, is one of the finest lawyers there is." Trial Transcript, Vol. 22, at 24.