Robert COHEN, Petitioner,

v.

UNITED STATES of America, Respondent.

Civil Action No. 96–11958–WGY.

United States District Court, D. Massachusetts.

March 31, 1998.

Robert Cohen, Montgomery, PA, pro se.

Victor A. Wild, Boston, MA, Paul G. Levenson, Boston, MA, for United States of America.

### *MEMORANDUM AND ORDER*

YOUNG, District Judge.

Robert Cohen ("Cohen") was convicted on July 8, 1993, of one count of conspiracy under 18 U.S.C. § 371, seven counts of bank fraud under 18 U.S.C. § 1344, and two counts of money laundering under 18 U.S.C. § 1957.[1]

At trial, the government proved that Cohen, James Smith ("Smith"), Richard Mangone ("Mangone"), and Ambrose Devaney ("Devaney") (collectively the "Defendants") fraudulently obtained tens of millions of dollars in real estate loans from the Barnstable Community Federal Credit Union ("Barnstable") and the Digital Employees Federal Credit Union ("Digital"). The illegal loans were used by certain of the Defendants to purchase commercial real estate on Cape Cod in hopes of later selling the property at

---

1. In 1995, the United States Court of Appeals for the First Circuit affirmed Cohen's conviction and the Supreme Court denied Cohen's petition for certiorari. *United States v. Smith,* 46 F.3d 1223, 1240 (1st Cir.), *cert. denied,* 516 U.S. 864, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995).

a profit. Cohen was the general counsel of and served as the closing attorney to both credit unions. Barnstable was co-founded by Smith, a real estate developer, and Mangone, the President of Digital. Lynn Vasapolle ("Vasapolle"), a co-conspirator and later a witness for the government, was the manager and custodian of the files for Barnstable.

The essence of the government's case involved the Defendants' participation in a conspiracy to circumvent Barnstable's and Digital's policies restricting "insider" loans. To effectuate the goals of their scheme, Smith, Mangone, and Devaney formed a series of nominee trusts to create the impression that the loans they fraudulently acquired were going to more borrowers than was actually the case. Once the funds had been obtained, these Defendants invested the funds in various pieces of commercial real estate.

Cohen implicated himself and allowed the scheme to flourish by preparing the trust instruments, preparing separate sets of genuine and false certificates, maintaining these parallel sets of documents in his files, submitting false certificates to Barnstable, and by allowing excess loan proceeds to be deposited in his client account. In at least one instance, Cohen signed a certificate misrepresenting himself and his wife as beneficiaries of such a trust.

Ultimately, the scheme unravelled after the Defendants were unable to sell a number of the properties on Cape Cod. In a last ditch attempt to cover up their conspiracy, the Defendants created new trusts, obtained new loans from the credit unions, and attempted to buy subdivisions from the previously established trusts. Once again, their efforts failed, and Barnstable was seized by regulators from the National Credit Union Administration (NCUA).

Jack I. Zalkind, Esq. ("Zalkind") represented Cohen during preliminary hearings

and at trial. At sentencing, Cohen was represented by Zalkind and Charles Rankin, Esq. ("Rankin").

Cohen now seeks relief pursuant to 28 U.S.C. § 2255, which provides that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground the sentence was imposed in violation of the Constitution or laws of the United States ... may move the court which imposed the sentence to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255.

## I. DISCUSSION

### A. Standard of Review

■ The court need not hold a hearing upon a habeas corpus petition if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Id.* Furthermore, a sentencing court may rely on its own recollections of previous events when deciding a motion brought under section 2255. *Blackledge v. Allison,* 431 U.S. 63, 74 n. 4, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).[2]

In interpreting Section 2255, the Supreme Court has required a showing of either constitutional or jurisdictional error, or a "fundamental defect" at trial resulting in a "complete miscarriage of justice." *Davis v. United States,* 417 U.S. 333, 346, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974); *see also Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). A habeas corpus petition under Section 2255 is *not* a substitute for a direct appeal, and a petitioner "must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady,* 456 U.S. 152, 166, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). In *Frady,* the Supreme Court held that petitions for collateral relief under Section 2255 are governed

**2.** Where a petition "(1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case," *United States v. DiCarlo,* 575 F.2d 952, 954 (1st Cir.1978), summary dismissal is appropriate. Moreover, "even a section 2255 petition predicated on specific assertions of fact allegedly supported in the record may be dismissed summarily by the district court," *Bar-*

*rett v. United States,* 965 F.2d 1184, 1186 (1st Cir.1992), provided "the district court can ... 'test' the allegations by assuming arguendo their truth, and then assessing their sufficiency in light of the relevant constitutional standards and the record." *Id.* (quoting *Moran v. Hogan,* 494 F.2d 1220, 1222 n. 1 [1st Cir.1974]); *see also United States v. Butt,* 731 F.2d 75, 77 (1st Cir.1984).

by the "cause and actual prejudice" standard, which states that:

> [T]o obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) "cause" excusing his double procedural default, and (2) "actual prejudice" resulting from errors of which he complains.

*Frady,* 456 U.S. at 168. In *Knight v. United States,* 37 F.3d 769 (1st Cir.1994), the First Circuit made clear that the "cause and prejudice" standard applies to both non-constitutional and constitutional claims, except for those asserting ineffective assistance of counsel. *Id.* at 772, 774 (in fact, "collateral attack is the preferred forum for [ineffective assistance of counsel] claims") (citing *United States v. Jadusingh,* 12 F.3d 1162, 1169–70 [1st Cir.1994]) (other citations omitted); *see also Smullen v. United States,* 94 F.3d 20, 23 (1st Cir.1996).

■ Cohen moves to have his sentence vacated, set aside, or corrected based upon prosecutorial misconduct, the alleged illegality of the sentence imposed, and ineffective assistance of counsel. Cohen has failed to show sufficient "cause" under *Frady* for his inability to raise claims of prosecutorial misconduct on direct appeal. The documents that Cohen has requested and received through the Freedom of Information Act, in anticipation of which the Court has delayed final disposition, add nothing of significance to his petition. Moreover, Cohen's claim that he was sentenced in violation of the Ex Post Facto Clause was raised and resolved on direct appeal and also will not be addressed by this Court.[3] Accordingly, this Court will only address Cohen's particular claims of ineffective assistance of counsel, as well as the claims of prosecutorial misconduct to the extent that Cohen has asserted that these actions were uncontested by defense counsel and amount to "ineffective assistance of counsel."

## B. *Ineffective Assistance of Counsel*

Cohen asks this Court to set aside his conviction on the basis of ineffective assistance of counsel. To prevail on his ineffective assistance of counsel claim, Cohen must demonstrate that 1) "considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness," and 2) "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceedings would have been different." *Lopez–Nieves v. United States,* 917 F.2d 645, 648 (1st Cir.1990) (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674[1984]). There is a strong presumption, however, that counsel has "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690. "[T]actical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim for ineffective assistance" of counsel. *United States v. Ortiz Oliveras,* 717 F.2d 1, 3 (1st Cir.1983).

### 1. *Character Witnesses*

Cohen contends that Zalkind was ineffective because he failed to introduce any evidence of Cohen's truth and veracity. Cohen concedes that the decision whether to offer character evidence is the "quintessential tactical decision," Cohen Reply at 8, but argues that here the decision fell below an objective standard of reasonableness because his attorney did not interview or call any of the persons he listed and told the jury would appear as character witnesses.

As the Supreme Court has recognized, opening the door to character evidence is fraught with tactical risks:

> The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the

---

3. This issue was fully litigated in Cohen's direct appeal. "Issues resolved by a prior appeal will not be reviewed again by way of a 28 U.S.C. § 2255 motion." *Murchu v. United States,* 926 F.2d 50, 55 (1st Cir.), *cert. denied,* 502 U.S. 828, 112 S.Ct. 99, 116 L.Ed.2d 70 (1991) (quoting *Dirring v. United States,* 370 F.2d 862, 864 [1st

Cir.1967]). This Court has made clear in the past, and remains unwavering, that when a petitioner's claims are rejected by, the First Circuit, there is no ground to come before this Court to request a new trial. *See Zannino v. United States,* 871 F.Supp. 79, 85 (D.Mass.1994).

law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him.

*Michelson v. United States,* 335 U.S. 469, 479, 69 S.Ct. 213, 93 L.Ed. 168 (1948). The First Circuit has also held that "[t]he decision to interview potential witnesses, like the decision to present their testimony, must be evaluated in light of whatever trial strategy reasonably competent counsel devised in the context of the particular case." *Lema v. United States,* 987 F.2d 48, 55 (1st Cir.1993).[4] Similarly,

> "[t]he decision to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony. The witness may not testify as anticipated, or the witness's demeanor or character may impress the jury unfavorably and taint the jury's perceptions of the accused; or the testimony, though sympathetic, may prompt jurors to draw inferences unfavorably to the accused."

*Id.* at 54 (citing *United States v. Porter,* 924 F.2d 395, 396 [1st Cir.1991]).

■ In view of the obvious tactical risks and limited benefits discussed above—benefits and risks which would have been readily apparent to experienced trial counsel without conducting an interview or further investigation—Zalkind's alleged failure to interview the proposed witnesses did not amount to ineffective assistance in the constitutional sense. In defending Cohen, Zalkind was faced with an abundance of physical and testimonial evidence that clearly implicated his client in the aforementioned scheme. Wisely allocating one's time and energy when faced with an abundance of evidence that strongly implicates your client in criminal behavior is clearly the tactical decision of reasonably competent counsel. Zalkind could have believed that the best prospect of acquittal lay in discrediting prosecution witnesses, rather than in investigating, inter-

viewing, and presenting additional character witness testimony. Even assuming arguendo that Zalkind's failure to interview and present character witnesses may have been less than reasonable under the circumstances, nothing in the record suggests that there is a reasonable probability that the result of the proceedings would have been different had Zalkind acted differently. Indeed, Zalkind was assiduous in raising evidence of Cohen's good character during trial, even seeking to cross examine Cohen's legal secretary as to his good character during the government's case in chief.

### 2. *Cohen's Right to Testify*

Cohen now contends that Zalkind precluded him from exercising his right to testify during trial following this Court's ruling partially excluding the proffered testimony of defense witness Richard Huber. Specifically, Cohen contends Zalkind was constitutionally incompetent 1) for failing to move to reopen the evidence following the above ruling, and 2) for failing properly to instruct Cohen as to what language should be placed in an affidavit presented to the Court.

Richard Huber, former dean of Boston College Law School and a nationally known authority on legal ethics, testified that on April 4, 1991, Cohen met with Huber and advised him that three of his clients had come to him and advised him that they had forged his (Cohen's) signature, and altered several documents in a number of files contained within his office. Huber further testified that he advised Cohen that ethically Cohen could not reveal any of the information involving his clients to authorities unless Cohen had been charged criminally or named in a civil suit.

At the very beginning of the trial, the government made a motion *in limine* to preclude all of Huber's testimony. This Court reserved ruling on that motion but nonethe-

---

4. In *Lema,* one of the petitioner's ineffective assistance claims rested on his counsel's failure to interview potential defense witnesses proposed by Lema. The district court summarily dismissed the claim on the ground that Lema's section 2255 motion failed conclusively to "overcome the presumption that . . . the challenged action

'might be considered sound trial strategy.'" *Lema,* 987 F.2d at 53 (quoting *Strickland,* 466 U.S. at 689). The First Circuit affirmed the summary dismissal of the petition holding that there was a presumption of reasonableness accorded to counsel's tactical decisions regarding the calling and interviewing of witnesses.

less, *at the beginning of trial,* advised Cohen and his counsel that Cohen would need to take the stand himself if he wished to introduce self-serving testimony regarding his own prior statements. (Transcript, Vol. 1 at 119). The government then presented its case in chief. At the close of the government's case, Zalkind announced "I do not intend to put on Mr. Cohen." (Transcript, Vol. 27 at 90).[5] *Following this announcement,* this Court discussed with counsel what portion of Huber's testimony it intended to admit and ruled that Huber's testimony regarding Cohen's statements about others would be admitted. The defense then moved forward and, on the last day of testimony, called Huber as a defense witness. The defense rested following Huber's testimony and moved forward to closing argument. Following the closing arguments of Cohen's codefendants, and just prior to Zalkind's closing, when Cohen's codefendants raised *Bruton* concerns arising from Huber's reference to Cohen's three clients—remember, Cohen was on trial with Smith, Mangone, and Devaney—this Court struck Huber's testimony. Following this ruling, Zalkind, now sailing a sharply different tack, protested to this Court that he would have asked Cohen to take the stand had he known prior to closing that Huber's testimony would be struck. Cohen also submitted an affidavit to the Court stating that he "would have chosen to testify" had he known Huber's testimony would be limited. This Court, and later the First Circuit, recognized neither as a motion to reopen the evidence.[6]

■ To come before this Court and contend that Zalkind was ineffective for failing to reopen the evidence, either by motion or by Cohen's affidavit, so that Cohen could take the stand, when the record clearly states that Cohen knew from the beginning of the trial that he would himself have to take the stand to introduce his self-serving testimony regarding his own prior state-

ments, strains credulity. This Court, therefore, finds Cohen's contentions devoid of merit and lacking in factual predicate. Additionally, even assuming arguendo that Zalkind had moved to reopen the evidence, and Cohen had been allowed to testify to his conversations with Huber, nothing in the record suggests that the result of the proceedings would have been different.

### 3. *Exculpatory Evidence in Loan Closing Packages*

Cohen contends that Zalkind failed to introduce in evidence records of the very early trusts and closing packages that were sent by Cohen to Barnstable. According to Cohen, these documents were exculpatory as they 1) disclosed to Barnstable the identities of Mangone, Smith, and Devaney as beneficiaries of the trusts and 2) were sent entirely intact thereby notifying Barnstable of Cohen's actual activities.

■ Numerous tactical reasons may have contributed to the decision not to introduce the early closing documents. The information, while exculpatory in some respects, does not detract from the evidence that 1) even if the accurate closing documents were sent, they were sent to a co-conspirator, Vasapolle, thereby minimizing their exculpatory nature, and 2) Cohen had kept separate sets of closing documents, one of which was accurate, the other which was patently false. This Court has previously held that a trial counsel's failure to proffer *potentially* exculpatory evidence does not amount to ineffective assistance of counsel if the decision to proffer that evidence appears to be no more than a tactical decision. *Zannino,* 871 F.Supp. at 81–83. Tactically, defense counsel likely viewed the fact that Cohen may have provided some accurate documentation to a co-conspirator, as no way minimizing the fact that many of the closing documents he provided were pat-

**5.** "[A] criminal defendant must claim his privilege or right to testify by attempting to take the stand or it is waived." *Siciliano v. Vose,* 834 F.2d 29, 30 (1st Cir.1987) (internal quotation omitted).

**6.** On appeal Cohen contended that he had been denied the right to testify. In response the First Circuit stated, "We are not persuaded. The striking of Huber's testimony may have upset his trial strategy, but it did not render Cohen less able to testify. Cohen never moved to reopen the evidence [either through Zalkind, or through his affidavit] so that he could take the stand." *United States v. Smith,* 46 F.3d 1223, 1233 (1995).

ently false. Even assuming Zalkind erred, this Court remains unpersuaded that the result of the proceeding would have been different had the jury been exposed to these documents.

### 4. *Cross Examination of Vasapolle*

Cohen argues that Zalkind failed to establish, through the cross examination of Vasapolle, that Barnstable had received a faxed memorandum from Cohen containing exculpatory evidence. The memorandum, which was directed to Vasapolle, related to a proposed transaction between Smith and Edward McCloud regarding the joint development of property owned by one of the trusts. The fax was never located within the Barnstable files following their seizure by the government. Cohen argues that Vasapolle's receipt of the memorandum was important evidence that Cohen had informed Barnstable of the proposed beneficial interest of Smith and the anticipated use of an indemnification agreement, and therefore Vasapolle was ultimately responsible for the fraudulent concealment of the true borrowers from Barnstable. Vasapolle testified that she had not received the fax and was later cross-examined by counsel for one of Cohen's codefendants on these issues.

■ Ineffective assistance of counsel claims for failure adequately to cross-examine are "utterly untenable" when a witness has been extensively and thoroughly cross-examined by the defense counsel of his codefendants. *United States v. Martinez–Molina,* 64 F.3d 719, 735 (1st Cir.1995). The record indicates that Devaney's counsel questioned Vasapolle extensively on whether she had received the fax. The memorandum, as well as the fax cover sheet, were placed in evidence by Zalkind and the jury was entitled to draw any inferences it considered appropriate from the proffered exhibits. The jury was equally entitled to draw an inference in favor of Cohen based on the fact that the fax was never located within the files of Barnstable. As a result, there is no merit in Cohen's claim that Zalkind's cross examination was constitutionally defective or that the outcome of his trial would have been

different had Zalkind established that Vasapolle received the fax.

### 5. *Cross Examination of Claire Beaudoin*

In the government's examination of Claire Beaudoin ("Beaudoin"), Beaudoin testified that Cohen had acted as Digital's counsel in a series of unlawful participation loans that had occurred between Digital and Barnstable beginning in 1985 and thereafter in each year through and including 1990. Cohen contends that Zalkind was ineffective in his cross examination of Beaudoin because he failed to press and discredit Beaudoin's allegedly perjured testimony 1) that she had routinely received letters from Cohen relating to participation loans made by Digital over the above-described period, and 2) that Cohen represented Digital in all the participation loans during the above described period. Cohen argues that he had no communication with Digital from 1986 through July, 1990, regarding any participation loan made after January 31, 1986.

■ Zalkind's decision not to press Beaudoin's testimony is clearly a tactical decision that "falls within the wide range of reasonable professional assistance ... which 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 [1955]). During Zalkind's questioning of Beaudoin, Zalkind asked:

> Is it not true, madam, that insofar as these participation loans are concerned, you under no circumstances, after these loans got underway, ever relied upon the opinion or the advice of the law firm of Cohen and Kushner?

(Transcript, Vol. 5 at 88). Beaudoin then rejected Zalkind's direct suggestion that she had not relied on Cohen and continued to resist Zalkind's persistent follow-up questions that would have de-emphasized Beaudoin's clear view that Cohen was indeed Digital's lawyer. Though removing Cohen from involvement in these unlawful participation loans would have assisted his defense, the First Circuit has stated that "[k]nowing when to quit is often a hallmark of commendable courtroom advocacy." *United States v.*

*McGill*, 11 F.3d 223, 228 (1st. Cir.1993). In the light of the fact that Zalkind's questioning was thoroughly professional, and this Court's view that to press Beaudoin's testimony would likely have injured Cohen more substantially, Cohen has not established that Zalkind's actions were so inadequate as to deprive him of effective assistance of counsel.

### 6. *Preparation and Cross examination of Frank Polak*

Cohen contends that because Zalkind failed to investigate government witness Frank Polak ("Polak"), Zalkind failed to discover evidence that Polak had a motive to provide perjured testimony. According to Cohen, this evidence included the fact 1) that NCUA conservators of Barnstable gave Polak, in June, 1991, second mortgage financing amounting to 100% financing on a piece of property, and 2) that in October, 1991, Polak went bankrupt. Cohen discovered this "impeachment evidence" following his trial upon review of both NCUA records and publicly available bankruptcy court filings. In addressing Cohen's claims of prosecutorial misconduct, the government has argued that this evidence was never in their possession.

■ In evaluating the decision to investigate, the First Circuit has held that defense counsel does not have to conduct an investigation to remain constitutionally effective. *See Lema*, 987 F.2d at 55 (quoting *Wilkins v. Iowa*, 957 F.2d 537, 540 (8th Cir.1992) )("[a] less than exhaustive investigation is adequate for constitutional purposes ... if reasonable professional judgments justified limiting its scope"). In the same light, the tactical decision not to investigate the background of a witness is clearly reasonable when an attorney is given no indication, either by the government's evidence or otherwise, that a particular witness may have committed acts

that have some impeachment value. Nothing in the record suggests that Zalkind was aware, or should have been aware, of the "impeachment evidence" to which Cohen now points. Reasonably competent "[c]ounsel need not chase wild factual geese [by conducting an investigation] when it appears, in light of informed professional judgment, that a defense is implausible or insubstantial as a matter of law, or, as here, as a matter of fact and of realities of proof, procedure, and trial tactics." *Cepulonis v. Ponte*, 699 F.2d 573, 575 (1st Cir.1983). Therefore, Zalkind's actions were reasonable tactical decisions that do not amount to ineffective assistance of counsel.

### 7. *Counsel's Failure to Recognize, Counter, or Object to Prosecutorial Misconduct*

Cohen asserts that but for the inadequacies of his incompetent counsel in failing to properly recognize, counter, or object to the prosecutor's individual and cumulative egregious conduct of 1) making an improper opening statement and closing argument, 2) using false and misleading testimony, and 3) committing *Brady* violations, Cohen would have been acquitted. After reflecting upon the entire trial, this Court does not accept the vast bulk of Cohen's conclusory allegations. The discussion that follows focuses on those matters of some substance.

#### a. *Opening Statement and Closing Argument*

Cohen contends that Zalkind was ineffective in his failure to recognize and object to what he characterizes as the prosecutor's misconduct and mischaracterizations made during the government's opening statement and closing argument.[7]

---

7. Specifically, Cohen argues that Zalkind was ineffective in his failure to detect and counter what he alleges were 1) the prosecutor's misquotation of mortgage terms; 2) the prosecutor's erroneous statement that a beneficial interest is an event of default under the mortgage of the trust; 3) the prosecutor's incomplete and misleading reference to restrictions on the transfer of beneficial interests set forth in the certificates of beneficial interest; 4) the prosecutor's false argument that Cohen's former associate was "blowing the whistle" to the NCUA; 5) the

prosecutor's false argument that Cohen shared in excess loan proceeds; 6) the prosecutor's false argument that Cohen prepared phony purchase and sale agreements; 7) the prosecutor's false argument that Cohen had not incurred personal liability on the $600,000 New Adventures Realty Trust Note; 8) the prosecutor's false opening statement that the closing binders Cohen prepared for Barnstable did not show the true purchase price for the trust properties; 9) the prosecutor's false opening statement and closing argument that Cohen knew the purpose

In addressing the effectiveness of counsel, the First Circuit has held that "[t]he Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of reasonably effective counsel under the circumstances." *United States v. Natanel,* 938 F.2d 302, 309–310 (1st Cir.1991) (citations omitted). In the same light, tactical decisions, whether wise or unwise, cannot generally form the basis of an ineffective assistance of counsel claim. *Ortiz Oliveras,* 717 F.2d at 3. In considering counsel's alleged ineffectiveness for failure to object during opening statement, the First Circuit has held that "[a] defense counsel's failure to object to [a] prosecutor's remark ... [may be] consistent with a reasonable tactical decision to minimize any harm the comment ... may have caused, by not inviting further attention to it." *United States v. Jackson,* 918 F.2d 236, 243 (1st Cir.1990); *See also Meis v. Wyoming Dep't of Corrections,* 9 F.3d 695, 697 (8th Cir.1993) ("Whether to object during closing argument to a slight mischaracterization of evidence is a strategic decision that deserves deference."); *United States v. Necoechea,* 986 F.2d 1273, 1280 (9th Cir.1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct.").

■ This Court is unpersuaded by Cohen's contention that Zalkind's failure to object was other than a reasonably based tactical decision. An ineffective assistance of counsel claim is *not cognizable* when, in hind-

sight, defense counsel failed to object to, or raise issue with, every minuscule instance that opposing counsel may arguably have misquoted or misargued the evidence. Zalkind's decisions as to what objections to raise clearly fell within the "wide range" of reasonable professional conduct articulated in *Strickland.*

### b. *Alleged False and Misleading Testimony*

Cohen contends that Zalkind was ineffective because he failed to object or counter the prosecutor's elicitation of false testimony.[8]

■ This Court finds no merit in Cohen's claim that the conduct alleged in footnote 7 amounted to prosecutorial misconduct. Cohen argues that in many of these instances the prosecutor "knew" or "should have known" that he was eliciting false testimony. This Court is unpersuaded that the testimony at issue, offered in the midst of trial, was anything other than the witness's accurate recollection of the facts. To question a witness, and receive an answer unfavorable to the opposing party, does not amount to prosecutorial misconduct, unless the prosecutor *knows* such testimony is perjured. In only one instance, the occasion where an F.B.I. evidence technician testified that no one had touched the fifteen boxes of Cohen's files prior to her testimony, could the prosecutor have been aware that the testimony was false given that the prosecution itself had reviewed the files some five times prior to trial. Though this was an egregious breach of document control discipline, both parties later stipulated to striking that witness's testimony in its entirety. If anything, the striking of this testimony favored Cohen's defense.[9]

---

of the Valley Brook and C. Leigh accounts, knew that Smith controlled them, and knew the number of transactions in which they were used; 10) the prosecutor's false opening statement that Cohen took tax write-offs on the trust properties; 11) the prosecutor's false opening statement that the indemnification agreements were "secret agreements"; and 12) the prosecutor's appeal to the jury's emotions during closing argument.

8. Cohen argues that Zalkind failed to object to the prosecutor's elicitation that 1) Cohen had a longstanding relationship with Barnstable and that he instructed Vasapolle as to the contents of

Barnstable's files; 2) Cohen had prepared false financial documents; 3) Cohen had knowledge of Barnstable's policy concerning certificates of beneficial interest; 4) Cohen kept excess loan proceeds; 5) Cohen was sued personally in connection with Berkshire Savings Bank's effort to collect on the New Adventures Realty Mortgage Trust; 6) No one had touched 15 boxes of files seized by the F.B.I. prior to the F.B.I. evidence technician testifying; and 7) Cohen had admitted to changing closing documents.

9. This Court notes that under the auspices of Cohen's ineffective assistance of counsel claim, Cohen has also failed to establish that had Zal-

### c. *Prosecutor's Alleged Failure to Provide Brady Material*

Cohen contends that Zalkind should have protested or countered the prosecutor's failure to provide 1) Barnstable's real estate loan files prior to December 1985, and 2) impeachment evidence concerning Frank Polak.

The Supreme Court in *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), stated that the government, in accordance with *Brady v.. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), must "disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Id.* It added that undisclosed "evidence is material only if there is reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* 473 U.S. at 682. "[I]n order to succeed on a *Brady* claim, [a defendant] must show that the evidence was exculpatory, as measured by its materiality." *United States v. Hemmer*, 729 F.2d 10, 14 (1st Cir.1984).

■ Upon review of the record before it, this Court holds that nothing in the pre–1985 Barnstable files—documents which related to activity outside the period of the conspiracy charged—or in witness Frank Polak's background is exculpatory, and therefore *"Brady"* material. Additionally, nothing in the record suggests that if Cohen had been provided with this material it would have undermined the established facts that Cohen took part in a continuing conspiracy to defraud several credit unions, such that the result of the trial would have been different. In light of these findings, this Court need not reach Cohen's ineffective assistance claim on this point, as the factual predicate that he had been deprived of *"Brady"* material does not exist.

kind acted differently, the outcome of his trial would have been different.

### d. *Prosecutor's Misrepresentation of Evidence at Sentencing.*

Lastly, Cohen contends that at sentencing counsel improperly failed to object to the prosecutor's misrepresentation of letters written by Cohen, and because of that failure, Cohen was sentenced in violation of the Ex Post Facto Clause.[10]

■ This Court once again discerns no merit to Cohen's claim that counsel was ineffective. The essence of Cohen's argument is that 1) this Court was totally unaware of the contents of the letters referred to by the government at sentencing, and 2) that this Court relied on those letters to determine the duration of Cohen's criminal activities. To the contrary, this Court was well aware of the letters' actual contents, as well as the totality of evidence that came before it during Cohen's seven week trial. To argue that defense counsel failed properly to object to the alleged mischaracterizations of these letters is entirely devoid of merit. Reasonably competent counsel would likely choose, as a matter of tactics, not to object to minor mischaracterizations of evidence at sentencing when the presiding judge at sentencing is the same judge that tried the case and the matters are, in any event, not central to any of the determinative criteria used in sentencing.

### II. CONCLUSION

For the foregoing reasons, this Court hereby **DENIES** the motion to vacate, set aside, or correct Cohen's sentence pursuant to 28 U.S.C. § 2255.

### JUDGMENT

Pursuant to the Memorandum and Order dated March 31, 1998, judgment shall, and hereby does, enter for the Defendant.

10. Cohen specifically alleges that the prosecutor misrepresented the contents of Cohen's January 21, 1991 letter to Barnstable, and Cohen's August 15, 1991 letter to Digital's attorneys.